IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALLIED PIPE HOLDINGS, LLC, and | § | |
| ALLIED MANAGEMENT, INC. | § | |
| Plaintiffs | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:21-CV-01315 |
| | § | |
| EDWIN P. PAULSEN, | § | |
| Defendant | § | |

## EDWIN F. PAULSEN'S RULE 12(B)(6) MOTION TO DISMISS

Defendant Edwin F. Paulsen (incorrectly named as Edwin P. Paulsen in the style) ("***Mr. Paulsen***") moves to dismiss the claims brought by Allied Pipe Holdings, LLC and Allied Management, Inc. ("***Allied***") pursuant to FED. R. CIV. P. 12(b)(6). First, the claims in Allied's Complaint are barred by a settlement agreement between the parties which is referred to in Allied's Complaint. Second, the claims in Allied's Complaint are barred because the noncompetition clauses that Allied seeks to enforce against Mr. Paulsen are unenforceable as a matter of law. Third, Allied's Complaint fails to allege sufficient facts to support a cognizable legal claim.

## I.        MOTION TO DISMISS STANDARD

1.        Under Fed. R. Civ. P. 12(b)(6), a claim may be dismissed either because it asserts a legal theory that is not cognizable as a matter of law, or because it fails to lend sufficient facts to support a cognizable legal claim. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 814 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin. Services, Inc.*, 925 F.3d 727 (5th Cir. 2019).

2.      To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level" and into the "realm of plausible liability." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 n.5 (2007); see also *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). In *Twombly*, the Supreme Court recognized that Rule 12(b)(6) must be read in conjunction with Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly*, 550 U.S. at 555; see FED. R. CIV. P. 8(a)(2). Although a plaintiff is not required to include "detailed factual allegations" in a complaint, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." *Twombly*, 550 U.S. at 555; see also *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Thus, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). A claim has "factual plausibility" when the plaintiff pleads factual content that allows the court to draw the reasonable inference that a defendant has acted unlawfully and requires "more than the sheer possibility that a defendant has acted unlawfully." *Id.* When the pleaded facts "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

3.      In assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion, the Supreme Court in *Iqbal* established a two-step approach. First, a court should identify and disregard conclusory allegations in the complaint because they are "not entitled to the assumption of truth." *Id.* Second, a court should consider the well-pleaded

factual allegations in the complaint to "determine whether they plausibly give rise to an entitlement to relief." *Id.*

4.      Generally, in deciding a motion to dismiss for failure to state a claim, the court limits its inquiry to facts stated in the complaint. *Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir. 2010). But if a document is central to the claim and is attached to or incorporated by reference into the complaint, it is not considered "outside the pleading" and can be considered by the court. *Id.; Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (permitting consideration of documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim); *see also Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000) (permitting consideration of documents that are referred to in the plaintiff's complaint and are central to plaintiff's claim).

5.      Additionally, dismissal under rule 12(b)(6) may be appropriate based on a successful affirmative defense if that defense appears on the face of the complaint. *EPCO Carbon Dioxide Products, Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006).

## II.      Settlement Agreement and Mutual Release Bars Allied's Claims

6.      Paragraphs 23 and 24 of the Original Complaint refer to a January 2021 Settlement Agreement and Mutual Release (the "***Settlement Agreement***"). A true and correct copy of the Settlement Agreement is attached as Exhibit A. Because Plaintiff referred expressly to the Settlement Agreement in its Original Complaint at ¶ 23-24, the court can properly consider it as part of a motion to dismiss. *Scanlan*, 343 F.3d at 536.

7.    The Settlement Agreement provided in pertinent part that:

**WHEREAS**, the Parties entered into a certain Purchase Agreement of Paulsen Pipe, LLC, effective August 28, 2019 (the "Purchase Agreement").

**WHEREAS**, disputes have arisen between the Parties as to aspects of the Purchase Agreement, specifically direct indemnity claims under Article XI, and the Purchase Price Retention Amount under Article II, of the Purchase Agreement (the "Disputes").

**WHEREAS,** the Parties, pursuant to the terms of this Settlement Agreement, have agreed to resolve and settle all claims and disputes, known or unknown, that the Parties may have concerning or relating **<u>directly or indirectly to the Purchase Agreement and/or the Disputes</u>**.

Exhibit A, p. 1. (emphasis added).

8.    The Settlement Agreement expressly provided that by paying the settlement amount and signing the agreement, the parties will finally settle and resolve any and all claims, demands, actions, suits and all sums of money or other relief whatsoever which have been asserted or which could have been asserted by the Parties against each other **<u>arising out of, or in any way relating to, the Purchase Agreement and/or the Disputes</u>**. Exhibit A, p. 2, ¶ 1.3. (emphasis added). The specific language of the release states:

In consideration hereof, **<u>Allied, its</u>** predecessors, successors, **<u>parents, direct subsidiaries, indirect subsidiaries, affiliates</u>**, assigns, agents, and attorneys hereby release and forever discharge Sellers and all of their respective predecessors, successors, assigns, agents, and attorneys from and against all actions, causes of action, claims, suits, debts, damages, judgments, liabilities, demands and controversies whatsoever, whether matured or unmatured, whether at law or in equity, whether before a local, state or federal court or state or federal administrative agency, commission or arbitration administrator, and whether now known or unknown, liquidated or unliquidated, that Allied now has or may have had, or thereafter claims to have, **<u>regarding the issues arising out of or directly or indirectly related to the Purchase Agreement or the Disputes</u>**, on

behalf of itself, or any other person or entity, at any time prior to and including the date of this Agreement.

Exhibit A, p. 3, ¶ 3.2. (emphasis added).

9.      For a settlement agreement to release a claim, the releasing document must "mention" it. *Victoria Bank and Trust Co. v. Brady,* 811 S.W.2d 931, 938 (Tex.1991) (holding that settlement of loan claim did not also settle line of credit claim where settlement only referred to the initial loan); *see also Mem'l Med. Ctr. of E. Tex. v. Keszler*, 943 S.W.2d 433, 434–35 (Tex. 1997) (holding that because the parties agreed that they would release all claims "relating to [Plaintiff's] relationship with [Defendant]" Plaintiff's claim for ETO exposure was released because it was related to his relationship with Defendant, and therefore was "mentioned" in the releasing document.). The mentioning does not require particularized enumeration or detailed description. *Stinnett v. Colorado Interstate Gas Co*., 227 F.3d 247, 255 (5th Cir. 2000). A release does not require that the parties anticipate and identify each potential cause of action relating to the release's subject matter. *Memorial Med. Center*, 943 S.W.2d at 435. That is, it is not necessary "for the parties to anticipate and identify every potential cause of action relating to the subject matter of the release." *Salama v. W. Wind Energy Corp.*, 4:12-CV-03535, 2013 WL 6079548, at *10 (S.D. Tex. Nov. 19, 2013), aff'd, 586 Fed. Appx. 183 (5th Cir. 2014)(holding that stock option grant was released by subsequent settlement agreement related to consulting services); *citing Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 848 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (citing *Keck, Mahin & Cate*

*v. National Union Fire Ins. Co.,* 20 S.W.3d 692, 698 (Tex.2000)); *see also A2D Technologies Inc. v. MJ Sys., Inc.,* 269 F. App'x 537, 542 (5th Cir.2008).

10.     Here, the Settlement Agreement expressly mentioned two matters to be released. First, the Settlement Agreement expressly mentions the "Dispute" which was defined as a dispute "between the Parties as to aspects of the Purchase Agreement, specifically direct indemnity claims under Article XI, and the Purchase Price Retention Amount under Article II, of the Purchase Agreement." Second, and more importantly for our purposes, the Settlement Agreement expressly recited that its purpose was to settle all claims relating directly or indirectly to the "Purchase Agreement." This is the same Purchase Agreement that Plaintiff bases its first count for breach of contract. Complaint, ¶ 35-38. The language of the release expressly released Plaintiff from "**all actions**, causes of action, claims, suits, debts, damages, judgments, liabilities, demands and controversies whatsoever, whether matured or unmatured . . . that Allied now has or may have had, or thereafter claims to have, regarding the issues **arising out of** or directly or indirectly related to **the Purchase Agreement** or the Disputes." Exhibit A, p. 3. (emphasis added).

11.     The Settlement Agreement "expressly mentions" the claims that Plaintiff sues on under the Purchase Agreement. Therefore, Plaintiffs count one should be dismissed because it fails to state "a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

### III.    The Noncompetition and Non-Solicitation Provisions are Unenforceable as a Matter of Law

12.    Although the Settlement Agreement released the claims, the noncompetition provision in the Purchase Agreement is unenforceable as a matter of law because it does not comply with the requirements of the Texas Noncompete Act. Additionally, because non-solicitation agreements are subject to the same analysis as covenants not to compete, the Confidentiality and Non-Solicitation Agreement ("**NSA**") attached to the Original Complaint as Exhibit A-2 is also unenforceable as a matter of law. *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 327 (Tex. 2014)("Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the Act.").

13.    A covenant not to compete is "enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COM. CODE ANN. § 15.50. As discussed *infra*, neither the noncompetition provision in the Purchase Agreement nor the non-solicitation provision in the NSA meet these statutory requirements.

14.    Because Allied's breach of contract claims depend on violations of: (1) the noncompetition agreement in the Purchase Agreement; and (2) the non-solicitation

provision in the NSA; and, because neither of those provisions are enforceable as a matter of law, Allied's complaint fails to state "a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

### a. Breach of Contract—Purchase Agreement

15.     The Noncompetition provision in the Purchase Agreement fails as a matter of law because it does not contain any limitation as to geographical area and because the scope of activity to be restrained is not reasonable and imposes a greater restraint than is necessary to protect the goodwill or other business interest of Allied Pipe Holdings, LLC.

16.     The Noncompetition provision provides:

(a) For a period of five (5) years following the Closing (or if any Seller enters into an employment relationship with Buyer or its Affiliates, from the date of termination of such employment), the Sellers will not, for his/its own account or jointly with another, directly or indirectly, for or on behalf of any individual, partnership, corporation or other legal entity, as principal, agent or otherwise:

    (i)     Own, manage, operate, join, control, or participate in the ownership, management, operation or control of, or be employed as an officer, employer, consultant, independent contractor, stockholder, partner, or in any other capacity with any entity that is engaged in competition with the Business.

*See* Exhibit A-1, p. 6. The Purchase Agreement defines "Business" as the "carbon pipe distribution, cleaning systems and other services related to the carbon pipe industry conducted by [Paulsen Pipe, LLC]." *See* Exhibit A-1, p. 1. The Purchase Agreement defines "Affiliates" as "any present or former officer, member, manager or Affiliate of the Company or the Sellers, any present or former known spouse, ancestor or descendant of any of the aforementioned persons or any trust or other similar entity for the benefit of

any of the foregoing persons." *See* Exhibit A-1, p. 18, ¶ 3.23.  These definitions push the Noncompetition provisions even farther beyond the boundaries of reasonableness.

17.    The noncompetition provision contains no restriction as to geographical area. *See* Exhibit A-1, p. 6. The "absence of a geographical restriction will generally render a covenant not to compete unreasonable." *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 212 (5th Cir. 2018). As such, Allied Pipe Holdings, LLC's claim for breach of the noncompetition provision in the Purchase Agreement fails because the noncompetition provision is unenforceable as a matter of law.

18.    The noncompetition provision also fails because by its very terms, the "scope of activity to be restrained" imposes a greater restraint than is necessary to protect the goodwill or other business interest of Allied Pipe Holdings, LLC. If the scope of activity restrained is not limited, courts routinely hold covenants unenforceable *See, e.g., McNeilus Cos., Inc. v. Sams*, 971 S.W.2d 507, 510-11 (Tex. App. - Dallas 1997, no writ) (affirming trial court's ruling that "prohibiting [employee] from working *in any capacity* for a [Plaintiff employer's] competitor was a restraint too broad in scope"); *APRM, Inc. v. Hartnett*, 2002 WL 1435995, at *5 (Tex. App. - Houston [1st Dist.] July 3, 2002, no pet.) (holding prohibition on being "involved in any manner" with competitor of [Plaintiff employer] "overbroad and unreasonable" because it "is not limited to the capacity in which [employee] worked for [Plaintiff employer]"); *McKissock, LLC v. Martin*, 267 F.Supp.3d 841, 855-56 (W.D. Tex. 2016) (finding non-compete prohibiting former employee from being "employed or retrained by, participate in or be connected *in any*

*manner* with any business or practice which is in competition with [former employer]"
was "as currently written, unreasonable.").

19.     Here, the noncompetition provision contains a restriction that Paulsen will
not "directly or indirectly…own, manage, operate, join, control, or participate in the
ownership, management, operation or control of, or be employed as an officer, employer,
consultant, independent contractor, stockholder, partner, or in **any other capacity** with
**any entity** that is engaged in competition with the Business." *See* Exhibit A-1, p. 6
(emphasis added).

20.     When it comes to interpreting contracts, text is paramount. "Objective
manifestations of intent control, not what one side or the other alleges they intended to
say but did not." *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763-64 (Tex. 2018). Courts
"presume parties intend what the words of their contract say" and interpret the contract
"according to its plain, ordinary, and generally accepted meaning unless the instrument
directs otherwise." *Id.* at 764. Surrounding facts and circumstances may inform the
meaning of an unambiguous contract's language, but such evidence cannot "make the
language say what it unambiguously does not say." *Id.* at 769. Text is especially
important in the context of restrictive covenants because the enforceability of a restrictive
covenant turns on its text. Courts routinely find covenants facially overbroad after
considering their text and hypothesizing about their scope. *See, e.g., Juliette Fowler
Homes*, 793 S.W.2d at 663 (non-compete "as written is an unreasonable restraint");
*Diversified*, 752 S.W.2d at 11-12 (geographic limitation "oppressive on its face");
*Tranter, Inc. v. Liss*, No. 02-13-00167-CV, 2014 WL 1257278, at *5 (Tex. App. - Fort

Worth Mar. 27, 2014, no pet.) (mem. op.) ("noncompete is unenforceable as written"); *Brown Servs., Inc. v. Brown*, No. 01-98-00304-CV, 1999 WL 681964, at *7 (Tex. App. - Houston [1st Dist.] Sept. 2, 1999, pet. denied) (mem. op.) (hypothesizing about scope of non-solicitation provision).

21.     Under the plain language of the noncompete, Paulsen could not even sweep the floors of a competitor. *Sentinel Integrity Sols., Inc. v. Mistras Group, Inc.*, 414 S.W.3d 911, 926 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (noncompete that which purported to prevent former manager from even sweeping the floors at a competitor was unenforceable as a matter of law). Nor could Paulsen own a single share of stock in a competitor. *Forum US, Inc. v. Musselwhite*, 14-17-00708-CV, 2020 WL 4331442, at *8 (Tex. App.—Houston [14th Dist.] July 28, 2020, no pet.) (noncompete which purported to prevent a former employee from owning even a single share of stock in a competitor or volunteering at a competitor's charity golf tournament is unenforceable as written).

22.     The noncompetition provision in the Purchase Agreement is unenforceable as a matter of law because: (1) it has no geographic limitation; and (2) it purports to restrict Paulsen from directly or indirectly working in <u>any capacity</u> with <u>any entity</u> engaged in competition. Because this provision is unenforceable as a matter of law, Allied Pipe Holdings, LLC's count 1 fails to state "a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

### b. Breach of Contract—NSA

23.    Like the noncompetition clause in the Purchase Agreement, the provisions of the NSA are also unenforceable because: (1) they are not supported by sufficient consideration; and (2) they impose a greater restraint than is necessary to protect the goodwill or other business interest of "The Allied Group of Companies" as vaguely defined in the NSA.

24.    In addition to the requirements that a covenant not to compete must contain reasonable limitations as to time, geographical area, and scope of activity to be restrained, the covenant must also be "ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." TEX. BUS. & COM. CODE ANN. § 15.50. There must be a contemporaneous exchange of consideration between the parties at the time the "otherwise enforceable agreement" is executed for the promise not to be illusory. *TMC Worldwide, L.P. v. Gray*, 178 S.W.3d 29, 37 (Tex. App.—Houston [1st Dist.] 2005, no pet.). "If anything in the classical law of contracts is clear, it is that past or future consideration is not good consideration. *Id.* Any exchange must be contemporaneous, because the promise and the consideration for that promise must serve as reciprocal conventional inducements. *Id.*

25.    Here, the NSA provided that "[i]n consideration for Employee's post-employment obligations under this Agreement, the Company agrees that it will provide Employee with access to the Company's confidential and proprietary information and trade secrets." Exhibit A-2, p. 1. However, a *promise* to give confidential information is not sufficient. *TMC Worldwide*, 178 S.W.3d at 38 (emphasis in original). Accordingly, a

promise to provide confidential information is illusory and cannot be the basis of an "otherwise enforceable agreement" unless (1) the employer promises to deliver the confidential information to the employee and (2) the employer actually delivers the confidential information at or near the time the employee makes the promise to keep the information confidential. *Id*. In this case the NSA does not state that the Company is promising to deliver the confidential information, nor does it recite that the Company is providing the alleged confidential and proprietary information. This promise is illusory. Therefore, the NSA lacks consideration and is unenforceable as a matter of law.

26.     Additionally, the NSA imposes a greater restraint than is necessary to protect the goodwill or other business interest of "The Allied Group of Companies."

27.     The NSA contains a defined term "Restricted Area" which however, the reach of the restrictive covenant found at section 3b does not limit itself to the "Restricted Area." A plain reading of the NSA's restrictive covenant contains no restriction as to geographical area. *See* Exhibit A-1, p. 6. The "absence of a geographical restriction will generally render a covenant not to compete unreasonable." *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d at 212. As such, the claim for breach of the noncompetition provision in the NSA fails because the noncompetition provision is unenforceable as a matter of law.

28.     As to the scope of the activity restrained, the NSA provided that:

In consideration for the promises made by Company herein, Employee agrees that for eighteen (18) months from the separation of his employment with the Company, whatever the reason for the end of employment, that he shall not directly or indirectly, in any capacity, solicit or otherwise provide any services to (for the purpose of providing Competing Business) any

customer, vendor supplier, sourcing partner or agent, with whom the Employee had business dealings on behalf of the Company during the two (2) year period prior to Employee's separation from the Company or about whom the Employee had access to Confidential Information.

*See* Exhibit A-2 to Original Complaint.

"Competing Business" is defined as:

The design, manufacture, selling, or promoting of products sold by the Company during the term of Employee's employment, including, but not limited to, the manufacture and master distribution of: carbon steel fittings and flanges; stainless steel and special alloy pipe; chrome-moly fittings and flanges; high-yield, high-pressure flanges, high yield, large OD/heavy wall butt-weld fittings; stainless, carbon, and special alloy gate, glove, check and ball valves; and/or other tubing, fittings, flanges, pipe, and valves used in oil and gas production facilities, oil and gas pipelines, shipyards, chemical and nuclear installations, and commercial mechanical markets.

*See* Exhibit A-2 to Original Complaint.

29.     First, the Company is a combination of affiliated entities which did not employ Paulsen, specifically "The Allied Group of Companies, including, but not limited to, all it [sic] **related** and **affiliated** companies (Allied Fitting, Warren Alloy, Allied Chrome, and Allied International)(collectively the "Company."" Exhibit A-2, p. 1 (emphasis added). This list makes determining what is competitive ultimately undefined and unlimited in scope. For example, the Declaration of Jeremy Blachman (attached to the Original Complaint as Exhibit A) mentions that Allied Pipe Holdings, LLC is wholly owned by Lilco LLC which in turn is owned by Marc and Judy Herzstein "and two trusts in which the Herzsteins are executors." By its plain language, the NSA purports to restrict Paulsen from competing with Lilco LLC and these trusts but without explaining what it is that they even do. Further, the NSA would restrict Paulsen from competing with other

unidentified entities Lilco LLC and these trusts, or even the Herzteins, own or control either now or in the future.

30.     Second, the restriction extends to any entity "about" whom the Employee had access to Confidential Information. By its own language the NSA purports to restrict Paulsen from soliciting entities with which he had had no dealings. Under Texas law, covenants not to compete that "extend[ ] to clients with whom the employee had no dealings during [her] employment" or amount to industry-wide exclusions are "overbroad and unreasonable." *D'Onofrio*, 888 F.3d at 211; *see also John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 85 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (a restraint on client solicitation is overbroad and unreasonable when it extends to clients with whom the employee had no dealings).

31.     Third, like the noncompetition provision in the Purchase Agreement, the scope of "Competing Business" the NSA purports to restrain imposes a greater restraint than is necessary to protect the goodwill or other business interest of "The Allied Group of Companies." The list of restrained activity amounts to an industrywide exclusion from oil and gas production facilities, oil and gas pipelines, shipyards, chemical and nuclear installations. Because this provision is unenforceable as a matter of law, Allied's count 2 fails to state "a claim to relief that is plausible on its face." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

32.     Under the plain language of the NSA, Paulsen could not sweep the floors of a competitor. *Sentinel Integrity Sols., Inc.*, 414 S.W.3d at 926. Nor could Paulsen

volunteer at a competitor's charity golf tournament is unenforceable as written. *Forum US, Inc.*, 2020 WL 4331442 at *8.

## IV.   Plaintiffs Failed to Allege Sufficient Facts to State a Claim

33.     Neither Plaintiff is a signatory to the NSA. Neither Plaintiff is named or even mentioned in the NSA. Although the Declaration of Jeremy Blachman (Original Complaint, Exhibit A) refers to the "Allied Group," the declaration does not define the term nor identify either Plaintiff as being a member of the "Allied Group." The NSA itself contains a similar term "The Allied Group of Companies" which it vaguely defines as all "related and affiliated companies (Allied Fitting, Warren Alloy, Allied Chrome, and Allied International)(collectively the "Company."" Exhibit A-2, p. 1. But the NSA does not list either Plaintiff as being part of the "The Allied Group of Companies."

34.     Also, the language of the NSA makes it clear that it covers a "customer, vendor, supplier, sourcing partner or agent, with whom the Employee had business dealings on behalf of the Company during the two (2) year period prior to Employee's separation from Company or about whom the Employee had access to Confidential Information. At no point in the Original Complaint do the Plaintiffs actually allege that the company Paulsen allegedly solicited was a person "with whom the Employee had business dealings on behalf of the Company during the two (2) year period prior to Employee's separation from Company." Nor is a violation of the noncompetition provision of the Purchase Agreement actually alleged, because neither of the entities mentioned in the Complaint (Bri Steel and Interpipe) is claimed to be "engaged in

competition." Indeed, nothing is said of Bri Steel, and all that is alleged is that Interpipe is "a vendor of Plaintiffs," not a competitor. Cmpl. ¶ 25.

35.     Finally, Plaintiffs purport to seek attorney fees.  However, "the procedures and remedies in an action to enforce a covenant not to compete provided by Section 15.51 of this code [and the Texas Noncompete Act] are exclusive and preempt any other criteria for enforceability of a covenant not to compete or procedures **and remedies in an action to enforce a covenant not to compete under common law or otherwise**." TEX. BUS. & COM. CODE § 15.52 (emphasis added). The Texas Noncompete Act does not provide for an award of attorney's fees for a plaintiff seeking to enforce a noncompetition provision and preempts an award under any other theory. *D'Onofrio*, 888 F.3d at 219; citing *Perez v. Tex. Disposal Sys., Inc.*, 103 S.W.3d 591, 594 (Tex. App.—San Antonio 2003, pet. denied).  That claim must be denied.

## IV.     PRAYER

Defendant Edwin F. Paulsen requests that the Court dismiss all claims against him with prejudice. Defendant Edwin F. Paulsen also prays that the Court grant him such other and further relief to which he may be entitled in law or equity.

Respectfully Submitted,

Hughes Watters Askanase, LLP

*//s// C. Ed Harrel*
State Bar No. 09042500
1201 Louisiana, 28th Fl
Houston, Texas 77002
Telephone: (713) 759-0818
Facsimile: (713) 759-6834
eharrell@hwa.com

**ATTORNEY FOR DEFENDANT
EDWIN F. PAULSEN**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Motion was served on opposing counsel pursuant to the Federal Rules of Civil Procedure, this 28th day of May , 2021:

Mark J. Levine
Weycer, Kaplan, Pulaski & Zuber, P.C.
24 Greenway Plaza, Ste. 2050
Houston, Texas 77046
*Via electronic service – mlevine@wkpz.com*

_____*//s// C. Ed Harrell*_____
C. Ed Harrell

## CONFIDENTIAL SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement (this "Agreement") is made this _____ day of January, 2021 by and between Allied Paulsen Pipe, LLC ("Allied" or "Buyer"), a Texas limited liability corporation with its principal place of business in Houston, Texas, on the one hand, and Edwin Paulsen and Craig Geers, individuals residing in Illinois ("Sellers"), on the other. The signatories to this Agreement hereinafter are referred to jointly as the "Parties."  This Agreement is made as a compromise between the Parties for the complete and final settlement of their claims, differences, and potential causes of action with respect to the matters described below.

### PREAMBLE

**WHEREAS**, the Parties entered into a certain Purchase Agreement of Paulsen Pipe, LLC, effective August 28, 2019 (the "Purchase Agreement").

**WHEREAS**, disputes have arisen between the Parties as to aspects of the Purchase Agreement, specifically direct indemnity claims under Article XI, and the Purchase Price Retention Amount under Article II, of the Purchase Agreement (the "Disputes").

**WHEREAS,** the Parties, pursuant to the terms of this Settlement Agreement, have agreed to resolve and settle all claims and disputes, known or unknown, that the Parties may have concerning or relating directly or indirectly to the Purchase Agreement and/or the Disputes.

**NOW THEREFORE**, in consideration of the mutual promises and releases in this Agreement and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Parties agree as follows:

### 1.0    SETTLEMENT

1.1    Within one day of the receipt by Allied's counsel, indicated in Paragraph 5.10 below, of an emailed copy of this Agreement executed by Sellers, Allied shall wire to Seller's

**Exhibit A**

designated bank account the amount of Three Hundred Thirty-Five Thousand Dollars ($335,000.00). This provision is predicated upon Allied's receipt of proper wire funding instructions.

      1.2    Within three days of receiving the executed copy of this Agreement from Sellers as described above, Allied shall execute this Agreement and deliver via email a copy of the fully executed Agreement to Seller's counsel, indicated in Paragraph 5.10 below.

      1.3    The Parties' performance of the obligations in Paragraphs 1.1 through 1.2 above, will finally settle and resolve any and all claims, demands, actions, suits and all sums of money or other relief whatsoever which have been asserted or which could have been asserted by the Parties against each other arising out of, or in any way relating to, the Purchase Agreement and/or the Disputes.

## 2.0    COMPROMISE

      2.1    This Agreement is the result of a compromise and shall never be construed as an admission by the Parties of any liability, wrongdoing, or responsibility on their part or on the part of their predecessors, successors, parents, subsidiaries, affiliates, attorneys, agents, officers, directors, shareholders or employees. Indeed, the Parties expressly deny any such liability, wrongdoing, or responsibility.

## 3.0    RELEASE

      3.1    In consideration hereof, Sellers, their predecessors, successors, assigns, agents, and attorneys hereby release and forever discharge Allied and all its respective predecessors, successors, parents, direct subsidiaries, indirect subsidiaries, affiliates, assigns, agents, directors, officers, employees and shareholders from and against all actions, causes of action, claims, suits, debts, damages, judgments, liabilities, demands and controversies whatsoever, whether matured

**Exhibit A**

or unmatured, whether at law or in equity, whether before a local, state or federal court or state or federal administrative agency or commission or arbitration administrator, and whether now known or unknown, liquidated or unliquidated, that Sellers now have or may have had, or thereafter claim to have, regarding the issues arising out of or directly or indirectly related to the Purchase Agreement or the Disputes, on behalf of themselves, or any other person or entity, at any time prior to and including the date of this Agreement.

      3.2    In consideration hereof, Allied, its predecessors, successors, parents, direct subsidiaries, indirect subsidiaries, affiliates, assigns, agents, and attorneys hereby release and forever discharge Sellers and all of their respective predecessors, successors, assigns, agents, and attorneys from and against all actions, causes of action, claims, suits, debts, damages, judgments, liabilities, demands and controversies whatsoever, whether matured or unmatured, whether at law or in equity, whether before a local, state or federal court or state or federal administrative agency, commission or arbitration administrator, and whether now known or unknown, liquidated or unliquidated, that Allied now has or may have had, or thereafter claims to have, regarding the issues arising out of or directly or indirectly related to the Purchase Agreement or the Disputes, on behalf of itself, or any other person or entity, at any time prior to and including the date of this Agreement.

**4.0    CONFIDENTIALITY**

      4.1    The Parties will not disclose to non-parties the contents of this Agreement or any matters pertaining to this settlement unless such disclosure is: (i) lawfully required by any governmental agency; (ii) otherwise required to be disclosed by law, or to taxing authorities; (iii) necessary in any legal proceeding to enforce any provision of this Agreement; (iv) to legal counsel, accountants and other tax, financial and legal advisors; or (v) subject to court order, subpoena or

**Exhibit A**

other legal process.  The Parties will notify each other in writing within five calendar days of the

receipt of any subpoena, court order, or administrative order requiring disclosure of information

subject to this non-disclosure provision.

**5.0     ADDITIONAL TERMS AND CONDITIONS**

5.1     This Agreement sets forth and constitutes the entire agreement between the Parties

with respect to their subject matter and supersedes any and all prior agreements, understandings,

promises, warranties, and representations made by each Party to the other concerning their subject

matter.  This Agreement may be modified only by a written document signed by all Parties.  No

waiver of this Agreement or of any of its promises, obligations, terms, or conditions shall be valid

unless it is written and signed by the Party against whom the waiver is to be enforced.

5.2     This Agreement may be executed in identical counterparts, each of which shall

constitute an original and all of which shall constitute one and the same Agreement.  Each Party

shall receive executed original signature pages from the other Party.

5.3     This Agreement is binding on the Parties and their predecessors, successors,

parents, direct subsidiaries, indirect subsidiaries, affiliates, agents, directors, officers, employees,

and shareholders.  Each of the signatories to this Agreement represents and warrants that he or she

is authorized to execute this Agreement on behalf of his or her respective Party and by such

signature to bind that Party to this Agreement.

5.4     If any part or any provision of this Agreement is finally determined to be invalid or

unenforceable under applicable law by a court of competent jurisdiction, that part or provision

shall be ineffective to the extent of such invalidity or unenforceability only, without in any way

affecting the remaining parts or provisions of this Agreement.

**Exhibit A**

5.5     The Parties hereby warrant and represent that they have not assigned nor in any way transferred or conveyed, all or any portion of the claims covered by this Agreement.  The Parties acknowledge and agree that this warranty and representation is an essential and material term of this Agreement, without which they would not have entered into it.

5.6     The Parties agree to bear their own costs, attorneys' fees and related expenses associated with the Disputes and, except as stated in Paragraph 5.7 below, this Agreement.

5.7     If any Party breaches any term of this Agreement and another Party is required to employ counsel or institute court proceedings to enforce its rights, the prevailing Party shall recover its reasonable attorneys' fees and costs incurred.

5.8     The Parties acknowledge that they have consulted with legal counsel of their choosing before entering into this Agreement, they have read this Agreement, they know and understand its contents, and they execute this Agreement freely and voluntarily.  In executing and giving this Agreement, each Party acknowledges that it has not relied on or made to the other Party or anyone purporting to act on its behalf any promise or representation that is not in this Agreement.

5.9     The Parties cooperated in the drafting of this Agreement, and if it is finally determined that any provision herein is ambiguous, that provision shall not be presumptively construed against any Party.

5.10    All copies and notices required under this Agreement shall be served via email as follows:

To Sellers counsel: Douglas M. Chalmers, dmc@chalmers-law.com.

To Allied counsel: Christine Kirchner, c.kirchner@chamberlainlaw.com.

**Exhibit A**

5.11    This Agreement shall be governed, in all respects, by the laws of the State of Texas, irrespective of its choice of law rules; and, any suit for enforcement must be filed in state or federal court (as may be appropriate) in Harris County Texas, and the parties agree that such forum selection shall be mandatory and not elective in nature.

5.12    The Parties agree to cooperate in good faith and execute any documents necessary to effectuate and/or consummate the terms of this Agreement.

**IN WITNESS WHEREOF,** we have hereunto set our hands and seals as of the date above written.


Allied Paulsen Pipe, LLC

By: _____
Name:
Title:

SELLER:


By: _____
      Edwin Paulsen


SELLER:


By: _____
      Craig Geers


**Exhibit A**

5.11   This Agreement shall be governed, in all respects, by the laws of the State of Texas, irrespective of its choice of law rules; and, any suit for enforcement must be filed in state or federal court (as may be appropriate) in Harris County Texas, and the parties agree that such forum selection shall be mandatory and not elective in nature.

5.12   The Parties agree to cooperate in good faith and execute any documents necessary to effectuate and/or consummate the terms of this Agreement.

**IN WITNESS WHEREOF**, we have hereunto set our hands and seals as of the date above written.

Allied Paulsen Pipe, LLC

By: _____
Name:
Title:

SELLER:

By: _____
Edwin Paulsen

SELLER:

By: _____
Craig Geers

**Exhibit A**

5.11    This Agreement shall be governed, in all respects, by the laws of the State of Texas, irrespective of its choice of law rules; and, any suit for enforcement must be filed in state or federal court (as may be appropriate) in Harris County Texas, and the parties agree that such forum selection shall be mandatory and not elective in nature.

5.12    The Parties agree to cooperate in good faith and execute any documents necessary to effectuate and/or consummate the terms of this Agreement.

**IN WITNESS WHEREOF,** we have hereunto set our hands and seals as of the date above written.

Allied Paulsen Pipe, LLC

By: _____
Name: _Jeremy Blashins_
Title: _COO/CFO_

SELLER:


By: _____
        Edwin Paulsen


SELLER:


By: _____
        Craig Geers

**Exhibit A**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALLIED PIPE HOLDINGS, LLC, and   §
ALLIED MANAGEMENT, INC.   §
        Plaintiffs   §
  §
V.   §     CIVIL ACTION NO. 4:21-CV-01315
  §
EDWIN P. PAULSEN,   §
        Defendant   §

## <u>ORDER GRANTING RULE 12(b)(6) MOTION TO DISMISS</u>

CAME ON FOR CONSIDERATION Defendant Edwin F. Paulsen's Rule 12(b)(6) Motion to Dismiss ("Motion") and the Court, having considered the motion and any response thereto is of the opinion that it should be GRANTED.  Therefore, it is

ORDERED that the Motion is GRANTED, and that this case and any claims asserted by Plaintiffs against Defendant Edwin F. Paulsen are DISMISSED WITH PREJUDICE.  It is further

ORDERED that each party is responsible for its own costs in this case.

_____
HONORABLE ANDREW S. HANEN
U.S. DISTRICT JUDGE